193 So.2d 86 (1966)
Luther H. STROUD, Plaintiff-Appellee,
v.
TREMONT LUMBER COMPANY, Defendant-Appellant.
No. 10630.
Court of Appeal of Louisiana, Second Circuit.
September 27, 1966.
On Rehearing January 4, 1967.
Writ Refused February 23, 1967.
*87 Theus, Grisham, Davis, Leigh & Brown, Monroe, for appellant.
Caldwell & Stewart, Jonesboro, for appellee.
Before GLADNEY, AYRES and BOLIN, JJ.
AYRES, Judge.
This is an action for workmen's compensation. Plaintiff was awarded compensation at the maximum statutory rate for total and permanent disability subject to payments made covering a period of time from July 7, 1964, to March 9, 1965. From a judgment thus rendered and signed, defendant appealed. Plaintiff has answered the appeal and prayed for the allowance of statutory penalties and attorney's fees.
The issues, factual in character, relate to the question of the extent and duration of plaintiff's disability, particularly to its continuation after March 9, 1965, and to the question as to whether defendant's failure to pay compensation thereafter was arbitrary, capricious, or without probable cause.
Plaintiff was engaged by Richard Gibson, a contractor of the defendant, to haul logs. While so employed and while driving a loaded truck out of the woods, the truck overturned, coming to rest upon its right side. As the truck overturned plaintiff fell across the cab, striking his head, back, and shoulders against the door or other metal parts of the truck. Severe and painful injuries were sustained. Plaintiff, unable to walk, was assisted from the wrecked truck to another vehicle and carried to Dr. William S. Marshall, Jr., a local physician in Chatham, Louisiana. Plaintiff was given sedation by hypodermic injection and instruction was given that he be immediately carried to the St. Francis Hospital in Monroe.
Plaintiff was hospitalized in Monroe under the care and treatment of Dr. Faheam Cannon, an orthopedic surgeon, for a period *88 of 16 days. Plaintiff's condition was diagnosed as an acute musculoligamentous strain of the paralumbar muscles on both sides of the lumbar vertebrae, the location of plaintiff's primary complaints. Plaintiff was administered the usual conservative treatmentsmuscle relaxants, pain medication, and heat massage to the lumbar area of his back, as well as bed rest. He was in traction for a period of eight days. Before his release from the hospital plaintiff was fitted with a lumbosacral corset which he continued to wear for several weeks thereafter.
After his discharge from the hospital, plaintiff continued as an outpatient of Dr. Cannon until November 24, 1964. During the period the doctor saw plaintiff in his office on seven occasions. On the first of these, August 3, 1964, it was noted in the doctor's report that plaintiff continued to complain of pain and discomfort in his back. By examination it was disclosed that his back motion was restricted both forward and backward, and that palpation produced pain over the lower lumbar area. The doctor also related, in his deposition, that on this occasion plaintiff was "having less swelling in his legs and feet," a condition which had not previously been noted in the doctor's reports.
On August 18, 1964, it was noted in the doctor's report that plaintiff continued to complain of pain in his low back and that, on this occasion, he complained of spasm and pain in the muscles of his neck and right leg. Back motion was noted only as moderately restricted. A notation was contained in the doctor's report of September 1, 1964, that plaintiff demonstrated approximately 75% of the usual range of back motion in all directions, but with a reversal of the lumbar curve on forward bending. Noted, also, were plaintiff's continued complaints of pain in the lower lumbar area. Back motion on September 15, 1964, was noted as limited to about the same extent as on the previous occasion, attended, however, with some discomfort.
Plaintiff reported to Dr. Cannon October 27, 1964, a continuation of headaches with which he had suffered since his hospitalization, and inability to work skidding logs because of soreness in the back and left side of his head, extending to and involving his left eye. Examination on that occasion disclosed that palpation produced pain along the inferior nuchal line on the left side, overlying the occiput. Five cc. of .5% Xylocaine were injected into the area of maximum tenderness which afforded immediate but temporary relief until that night. Plaintiff reported to the doctor, as the latter noted in his report of November 4, 1964, that his suffering had not been as severe or prolonged as previously. Again palpation was found to produce pain over the left occiput in the area of the nuchal line.
Dr. Cannon's notes revealed that on the last of these visits, November 24, 1964, plaintiff complained of continued pain in the upper part of his neck and over the top of his head, followed by a feeling of weakness. The doctor was impressed, however, that plaintiff was able to return to work. He advised that if plaintiff found himself unable to work his condition should be evaluated by a neurosurgeon, and, for that purpose, Dr. Philip Bonn was recommended.
Plaintiff's complaints having persisted, Dr. Bonn made an examination of plaintiff December 23, 1964, and upon that examination testified:
"There was minimal cervical paraspinal muscle spasm, which means spasm in the back part of his neck on both sides of his spine, with cervical movements, or movement of the neck, precipitating upper neck pain, or cervical pain. There was tenderness to the suboccipital areas over the greater occipital nerves, and, again, this is the juncture of the head and neck. There was nonanatomical numbness to the left hand and numbness to the lower one-third of the right lower leg and foot. In other words, it did not fit any nerveroot *89 pattern. The deep tendon reflexes were active and equal bilaterally and there were no pathological reflexes. Deep tendon reflexes is tapping the tendon to see if this is a normal response or hyperactive or diminished and these were normal. Pathological reflexes is a short circuit reflex which he did not have. There was weakness to dorsiflexion of both feet, meaning pulling the feet up towards the head."
The muscle spasm was said by Dr. Bonn to restrict the cervical movements. Tenderness was found over the greater occipital nerve at the juncture between the head and neck.
Plaintiff's complaints of severe headaches were, in the doctor's opinion, consistent with and caused by a bilateral myoligamentous sprain and by the muscle spasm noted by the doctor in plaintiff's cervicalspinal area. Dr. Bonn stated that all of plaintiff's complaints of pain, including the headaches, could be related directly to the trauma sustained in the accident, due to a bruising of the nerves themselves or an encroachment of the muscles thereon as a result of muscle spasm. In correspondence incorporated in the record a series of questions was asked Dr. Bonn, from which we quote:
Q. In your opinion, what is the cause of the severe headaches being suffered by Mr. Stroud?
A. Occipital neuralgia; the accident caused a cervical myoligamentous sprain and occipital neuralgia and the neuralgia is due to his trauma.
Q. If the headaches are being caused by something being wrong with the occipital nerve or nerves, in your opinion, what appears to be wrong with the nerves and what is the cause of the same?
A. The accident caused a cervical myoligamentous sprain and occipital neuralgia and the neuralgia is due to his trauma.
Q. In your opinion, can the pain, etc., which Mr. Stroud suffers from be related to the accident which he described to you?
A. The pain he suffers from can be related to his accident.
Q. Assuming that Mr. Stroud is still suffering from these severe headaches which he described to you, what do you recommend be done to relieve them?
A. As I previously stated, if he does not respond to blocks to the occipital nerves, patient should have an occipital neurectomy, or cutting the occipital nerves in the junctions of the head and cervical area.
Thus, it is noted that in some important particulars, with reference to plaintiff's injuries and endurance of pain, Drs. Cannon and Bonn are in accord, notably as to tenderness and spasm in the area of the occipital nerves, as well as the cause and effects thereof which, however, are shown in more detail by the testimony of Dr. Bonn, reference to which has already been made.
The findings of Dr. Frederick C. Boykin, a neurosurgeon who examined plaintiff at defendant's request on June 16, 1965, are, at least in part, in accord with the findings of Drs. Bonn and Cannon. In his report, Dr. Boykin said, with reference to the cervical spine, there was perhaps 25% limitation of motion and tenderness to palpation along the nuchal line and over the spinous processes. Flexion of the lumbar spine was found to be only 80% of normal and its demonstration was accompanied by complaints of pain across the lower lumbar area. Hyperextension was said to produce mild pain in the same area. The doctor, however, discounted the disabling effects which had been attributed to these findings.
Predicated upon the contention that plaintiff's claim for compensation is primarily based upon injuries allegedly sustained to his cervical spine, much is attempted to be *90 made of Dr. Cannon's testimony that plaintiff never complained of injuries in that area until after his release from the hospital. We are not impressed with this contention. First, Dr. Cannon's testimony in this regard is emphatically denied by plaintiff, who testified that during the interval of his hospitalization the traction equipment was temporarily loosened to permit a visit to a bathroom, whereupon he experienced pain and discomfort in his cervical spine. This manifestation was, according to plaintiff's testimony, reported to the doctor upon the doctor's next visit. As a basis for his testimony, the doctor relied upon his record which contained no notation of such complaint.
While it is only human to err and memory is at times unreliable, it may be pointed out that the doctor did not remember, nor did he make a notation on his records or in his reports, that plaintiff had been placed in traction. The record, moreover, discloses the probability of the existence of a valid reason why plaintiff did not sooner complain of injury to his cervical spine. The greater pain may have originated in the lumbosacral area. Too, because of his condition of pain and suffering and the administration of sedation, plaintiff may have been unable to exactly locate all areas causing pain. Moreover, it would appear reasonable to suppose that the sedation administered to alleviate the pain in the lumbar area would likewise serve to relieve pain in the cervical area.
The record, to which we have referred abundantly in our opinion, establishes plaintiff's continued total and permanent disability. Plaintiff, an uneducated man, was an unskilled laborer who earned his living and supported his family through manual labor. Other than on two prior occasions when he sustained accidental injuries, in 1945 and 1961, plaintiff has been a steady worker. Since sustaining the injuries with which we are now concerned, plaintiff is no longer able to perform manual labor such as driving a log truck. His condition of nervousness, weakness, and pain, as related not only by him but by his wife and his daughter, based upon their knowledge gleaned from observations made while living in constant and close association with him, supports the conclusions which we have reached from a review of the medical testimony.
The defendant contends, however, that plaintiff's claim is predicated solely upon the injuries claimed to have been sustained to his cervical spine and that, as to those, there is no causal relationship with the accident in which plaintiff was involved. As we have heretofore pointed out, this contention is without merit. No factual basis exists to support it. Under a similar contention, it was observed in Richard v. Barber Brothers Company, 112 So.2d 168, 170, La.App., 1st Cir. 1959:
"Counsel for appellant correctly contends that if the plaintiff was actually unable to work at the time of the trial because of a disability which was medically related to the initial accident, then in the absence of any evidence as to any other accident the court would be in error in ascribing the present disability to some unshown subsequent injury. For where a continued disability is proven which relates back to the initial accident during the employment, the burden is on the employer to prove that some other accident caused the disability and not upon the employee to prove that no other accident occurred. White v. Calcasieu Paper Co., La.App. 1 Cir., 96 So.2d 621; Fee v. Calcasieu Paper Co., La.App. 1 Cir., 89 So.2d 434; Turner v. Southern Industries Co., La.App. 1 Cir., 88 So.2d 238."
On the question of liability for penalties for terminating and discontinuing the payment of compensation benefits through arbitrary or capricious action or without probable cause within the meaning of the provisions of LSA-R.S. 22:658 or *91 23:1201.2, the facts speak for themselves. Payment was stopped, as heretofore noted, March 9, 1965. We find no possible justification for this action; nor has counsel pointed out any basis therefor. The only excuse which we are able to find in the record is a note from Dr. Marshall which reads as follows:
 "WILLIAM S. MARSHALL, JR., M.D.
 Chatham, Louisiana
 February 6, 1965
"Dear Sir:-
 "On January 30, 1965, I discharged Luther H. Stroud. In consultation
with Dr. Faheam Cannon of Monroe, Louisiana, however, he had been
referred to Dr. Philip Bonn of Shreveport, Louisiana, for evaluation. You
received a copy of Dr. Bonn's report to me dated December 24, 1964. As
you know, Dr. Bonn recommended bilateral greater and lesser occipital
neurectomies if his symptoms persisted.
 "Very truly yours,
 "W. S. Marshall, Jr., M.D."
It will be noted from a reading of the document itself that while it is stated plaintiff was discharged by the doctor, the instrument does not disclose from what or for what reason he was discharged, that is, whether he was discharged from further treatment or whether he was able to return to work. However, the note does point out that, in consultation with Dr. Cannon, plaintiff had been referred to Dr. Bonn, and, further, that defendant had been furnished a copy of Dr. Bonn's report of December 24, 1964, in which specific recommendations were made for further and drastic treatment if plaintiff's symptoms persisted. Nevertheless, the record is barren of any proof of any effort whatsoever on the part of defendant to thereafter determine plaintiff's true condition, notwithstanding defendant received a copy of the doctor's report more than a month before discontinuing the payment of plaintiff's compensation. Reliance upon Dr. Marshall's communication was not sufficient evidence of defendant's good faith, for the doctor failed to give even the slightest indication that plaintiff was able to return to the duties of his former employment.
Under these well-established factual circumstances, we think the discontinuance of compensation was entirely arbitrary. It therefore follows that plaintiff is entitled to the penalties provided by statute. The penalty provision of the appropriate statutes (LSA-R.S. 22:658 and 23:1201:2) apply only to amounts past due for more than 60 days. McClelland v. Liberty Mutual Insurance Company, 180 So.2d 19, 21, La.App., 2d Cir. 1965, and the numerous authorities therein cited.
In addition to the penalties, plaintiff is entitled to recover a reasonable attorney's fee. The statutory basis for this entitlement has been the subject of discussion, notably in Cain v. Employers Casualty Company, 96 So.2d 527, La.App. 2d Cir. 1957 (writ granted); Id., 236 La. 1085, 110 So.2d 108 (1959); Redding v. Cade, 158 So.2d 880, La.App., 3d Cir. 1963.
As pointed out in McClelland v. Liberty Mutual Insurance Company, supra, the amounts of attorneys' fees fixed by the courts under the penalty statutes vary with reference to the nature and extent of the services performed and the amounts of recovery. *92 As was noted in that case, there is a considerable body of jurisprudence fixing penalty attorney's fees varying in amounts from $1,500 to $3,000.
In the instant case, we note that the trial of the case on its merits in the district court consumed one day; that depositions of the medical experts were taken in both Monroe and Shreveport; and, of course, that from the judgment of the trial court the matter has reached this court on appeal. After a careful study of the case before us, we feel that an allowance of $2,000 as an attorney's fee would be reasonable.
Attention is directed, however, to the pronouncements in Cain v. Employers Casualty Company, supra, to the effect that an award of penalty attorney's fees is in lieu of fees agreed upon between a claimant and his counsel in accordance with the provisions of the workmen's compensation statute. Hence, the provisions of the judgment approving an attorney's fee to be paid out of plaintiff's compensation must be deleted.
For the reasons assigned, the judgment appealed is amended and recast to read as follows:
It is therefore Ordered, Adjudged, and Decreed there be judgment herein in favor of the plaintiff, Luther H. Stroud, and against the defendant, Tremont Lumber Company, for the full sum and compensation of $35 per week beginning July 7, 1964, and continuing for the duration of plaintiff's disability, not, however, exceeding 400 weeks, less compensation paid covering the period from July 7, 1964 to March 9, 1965, with interest at the rate of 5% per annum on each of the weekly installments from its maturity until paid, and together with 12% of each of the installments, or payments, overdue for more than 60 days, or which shall hereafter become overdue for more than 60 days, as a penalty, and for the further sum of $2,000 as an attorney's fee.
It is further Ordered, Adjudged, and Decreed that the expert-witness fees of Drs. Philip Bonn and Faheam Cannon be, and they are hereby, fixed at the sum of $50 each and, as such, taxed as cost.
It is further Ordered, Adjudged, and Decreed that plaintiff's future claims for medical, surgical, and hospital services, and for medicines, or for such as may have been incurred since the institution of this action, within statutory limits and subject to such expenses heretofore paid by defendant, be reserved.
It is further Ordered, Adjudged, and Decreed that the defendant pay all costs of court, including the cost of this appeal, and, as thus amended and recast, the judgment appealed is affirmed.
Amended and affirmed.
GLADNEY, Judge (dissenting):
With respect, I dissent from the findings of the majority of the court, it being my opinion that plaintiff has failed to prove disability continuing beyond March 5, 1965, at which time compensation payments ceased.
Pertinent medical testimony was furnished only by Drs. W. S. Marshall of Chatham, Louisiana, plaintiff's personal physician, Faheam Cannon, orthopedist of Monroe, Louisiana, and Philip Bonn, neurological surgeon of Shreveport. Dr. Cannon testified Stroud made no complaint of cervical sprain during the first six weeks of his treatment. On November 24, 1964 Dr. Cannon was of the opinion that his patient had completely recovered and was able to return to work. At that time, according to Dr. Cannon's findings, there was no indication of any muscle spasm. However, because of persistent complaints of headaches, the patient was referred to Dr. Philip Bonn, who made one examination on December 23, 1964. As we understand Dr. Bonn's findings, they were negative of any objective findings, except for "minimal cervical muscle spasm" and that plaintiff's symptoms were related to headaches, *93 as a cure for which the doctor recommended operative procedure upon certain occipital nerves. The advisability of such an operation was rejected by Dr. Fred C. Boykin, who made a neurological examination of Stroud on June 16, 1965. The findings of Dr. Boykin were negative as to disability. On January 20, 1965 Dr. Marshall, after consideration of the report of Dr. Bonn, discharged plaintiff as able to return to work.
Accordingly, it is my conclusion that plaintiff has failed to discharge the burden of proof required of him to establish his continuing disability beyond March 5, 1965.

ON REHEARING
BOLIN, Judge.
This rehearing was granted for the limited purpose of reconsidering that portion of our decree imposing statutory penalties and attorney's fees.
On appeal two basic questions were presented: (1) Whether plaintiff has shown his entitlement to a judgment for total and permanent disability beyond the date of March 5, 1965, the date his employer discontinued such payments; (2) If the first question is answered in the affirmative, did the employer have sufficient evidence before it on March 5 to justify its discontinuing payments so as not to stigmatize its actions as arbitrary or capricious?
The two stated questions are separate and distinct. On the date the case was tried in the lower court there was serious dispute as to whether plaintiff was entitled to recover on the merits of his demands. This was due principally to the conflicting medical testimony which was based on facts either unknown to defendant or discovered after it had discontinued compensation payments on March 5, 1965. However close this factual question might have been, the lower court and a majority of this court in our original opinion concluded plaintiff had borne his burden and had established his entitlement to total and permanent disability as of the date of trial.
The crucial date for determination of the second question is March 5, 1965, the date defendant discontinued workmen's compensation payments to plaintiff. This determination must be made on the basis of the information and evidence defendant had before it on that date. As correctly pointed out in our original opinion, the only medical evidence then available to defendant were the letters from Drs. Marshall, Cannon and Bonn. These letters are in the record and their contents are clear. Dr. Marshall simply discharged Stroud on February 6, 1965, with the explanation that he had been referred to Drs. Cannon and Bonn. The letter of "discharge" calls Tremont's attention to Dr. Bonn's letter of December 24, 1964, wherein he recommended "bilateral greater and lesser occipital neurectomies if his symptoms persisted." Additionally Dr. Bonn, on January 27, 1965, informed counsel for defendant that plaintiff's symptoms were still manifesting themselves.
Following a most careful review of the record we are unable to find error in our original judgment. Mindful of the dissenting opinion by our brother of this court from the majority's finding of liability, we thought it not only appropriate but necessary that we make the above comment.
For the reasons assigned the original decree is reinstated and made the judgment of this court.
GLADNEY, J., dissents.