HALL, Judge.
This is a suit for workmen’s compensation. The plaintiff, Clarence Duplantis, was injured on June 10, 1965 while working for S. K. Whitty & Company, Inc., a pile driving contractor. His injury consisted of a severe compound comminuted fracture of the proximal phalanx of his left thumb caused by a heavy piece of iron falling on his hand while he was helping to load a truck. He brought this suit against Highlands Insurance Company, compensation insurer of S. K. Whitty & Company, Inc., on June 10, 1966 praying for compensation benefits for permanent total disability at the rate of $35.00 per week and for statutory penalties and attorney’s fees.
The case was tried on April 30, 1968 and resulted in a judgment in plaintiff’s favor for 50 weeks compensation at the rate of $35.00 per week commencing November 1, 1967 subject to a credit for all payments *625 made subsequent to that date. The judgment dismissed all other demands of plaintiff.
It is thus seen that the judgment of the Trial Court is based upon the schedule of specific losses under LSA-R.S. 23:1221(4) instead of LSA-R.S. 23:1221(2) for injury-producing permanent total disability as prayed for by plaintiff. Plaintiff appealed. Defendant neither appealed nor answered the appeal.
On the date of the accident plaintiff was taken to Mercy Hospital where he was seen in the emergency room by Dr. George C. Battalora, Jr., an orthopedic surgeon. Dr. Battalora operated on plaintiff that same night, the operation consisting of a bone graft in an attempt to save the thumb. Plaintiff’s hand was put in a cast and he was discharged from the hospital on June 17, 1965. On June 30, 1965 Dr. Battalora removed the cast and replaced it with a short arm cast which covered the hand and reached to just below the elbow. This cast was removed on July 21, 1965 at which time x-rays showed the union of the bone graft was not complete. Dr. Batta-lora continued to treat plaintiff. Dr. Bat-talora testified that on August 11, 1965 plaintiff told him that he had been working at light duty the past week. The doctor cautioned him about using his left hand. As of October 8, 1965 plaintiff had no active motion at the last joint of the thumb. X-rays taken on October 28, 1965 revealed a false joint in the grafted bone. On December 2, 1965. Dr. Battalora noted that he felt an additional operation would be required to stabilize the distal portion of the thumb and requested that plaintiff return in one month but plaintiff did not return until June 29, 1966 at which time plaintiff told the doctor he had been working steady at light duty “pushing a crew” (i. e. acting as foreman) but complained of increased pain in the thumb and inability to grip anything. False motion was again demonstrated at the distal end of the graft and this was painful. X-rays showed a non-union of the graft. Plaintiff insisted that the thumb he amputated but Dr. Bat-talora was unwilling to resort to such a radical remedy and persuaded plaintiff to see Dr. Daniel C. Riordan, an orthopedic surgeon, who specialized in the treatment of hands. After this June 29, 1966 visit Dr. Battalora did not see plaintiff again.
Dr. Riordan examined plaintiff’s thumb on June 30, 1966 and thought it best to attempt another fusion of the distal phalanx to the proximal phalanx and to the bone graft. The operation was performed by Dr. Riordan at Touro Infirmary on July 3, 1966. A fusion was performed and two pins or Kirschner wires were used to hold the bone fragments and plaintiff’s hand was put in a cast. Dr. Riordan testified (by deposition) that plaintiff did not return to his office until August 13, 1966 because plaintiff was in the Gulf working and couldn’t get in for his scheduled visit. At this visit on August 13 the cast was removed and replaced with a splint. On September 3, 1966 one of the two pins had protruded through the skin and was removed. The other pin was left in for support. Plaintiff was seen periodically and on November 22, 1966 there was still no fusion of the distal phalanx to the proximal phalanx.
Plaintiff next saw Dr. Riordan on August 29, 1967. He still complained of pain and inability to use his thumb. X-rays revealed the bone graft was not solid. The doctor noted that the bone was being held together by fibrous scar tissue which allowed movement, and testified that plaintiff would have pain whenever he would have motion of the distal phalanx in grasping an object.
Another fusion operation was proposed by Dr. Riordan which he scheduled for December 1, 1967 but plaintiff called the doctor later and told him he did not want to go through a third operation.
Dr. Riordan testified that the proposed operation would get rid of the pain if successful; that the operation would not require a general anesthetic, but no one *626 could tell the chances of a successful fusion. He further testified that the operation, if successful, would not change plaintiff’s loss of function of the thumb which he rated at 50%.
On cross examination Dr. Riordan testified that the cast he put on plaintiff’s hand after the operation of July 3, 1966 reached up his forearm to just below the elbow and covered his hand to the base of the fingers and covered the thumb out to the tip.
On October 31, 1967 Dr. Riordan reported to the defendant insurer that plaintiff would have a permanent partial limitation of motion of the left thumb estimated at 50%.
Dr. Santo LoCoco, an orthopedist, testified as an expert witness on behalf of plaintiff. He examined plaintiff on April 6, 1966 which was prior to the operation by Dr. Riordan and again on April 24, 1968 which was after Dr. Riordan’s operation and approximately one week before the trial.
On his examination of April 24, 1968 Dr. LoCoco found that plaintiff’s thumb from the interphalangeal joint to the tip of the thumb was fused out straight in the position of optimum function. He noticed some discomfort in the thumb upon gripping. He further found the metacarpal joint subluxed, or partially dislocated, and testified that this would cause some weakness in the joint. The doctor testified that plaintiff had a 25% permanent partial disability of the hand due to a loss of function of the thumb.
Compensation payments of $35.00 per week were paid to plaintiff from the date of his accident until August 5, 1965 when the compensation payments were terminated because the claim file prepared by an independent adjuster indicated plaintiff had returned to work. Compensation payments were resumed on July 2, 1966 when plaintiff was admitted to the hospital for the operation by Dr. Riordan. (It was during the period between the termination and resumption of payments that this suit was filed.) Payments were again stopped on September 30, 1966 because the file showed plaintiff was working, and were again resumed on November 1, 1967 based on Dr. Riordan’s medical report establishing that plaintiff would have a 50% permanent partial loss of function of the left thumb.
The issue presented by this appeal is whether plaintiff is permanently and totally disabled to do the work he was employed to do when injured.
Plaintiff is a piledriver man by trade. He had worked for Horace Williams for 29 years part of the time as a pile driver crew member and part of the time as a crew foreman, and quit when Mr. Williams died. He secured employment with S. K. Whitty & Company, Inc. through the local pile driving union, and had worked about a week when the accident occurred. At the time plaintiff was hired S. K. Whitty & Company, Inc. was loading equipment in its New Orleans yard for use on a pile driving job it had undertaken at Venice, Louisiana. Plaintiff was injured while helping to load this equipment.
Although defendant made some effort to show that plaintiff was hired by Whitty as a pile driver foreman, the record clearly reveals that he was hired and paid as a pile driver crewman, although he was promised that he would be made a foreman on the Venice job if and when a vacancy occurred.
A pile driver crewman is in our opinion a skilled or at least a semi-skilled laborer. His functions are divided into three basic categories: loftsman, header and leadsman. The foreman designates the work which each crewman is to perform on a particular day and on any day a crewman may be designated to work either as a loftsman, a header or a leadsman.
The duties of a loftsman are to set the head of the pile in proper position under the hammer. In order to do this he must *627 climb 20' to 16CK (depending upon the length of the pile) up a straight steel ladder attached to the rig until he gets to a board out beyond the leads of the rig which is called the loft. He stands on this loft holding a fá" roPe one end of which is tied to one side of the leads. When the rig lifts the pile up the loftsman whips the rope around the pile and then pulls the head of the pile under the hammer and watches it until it gets in place and the operator lets the hammer down on it. He then descends from the loft because it would be too dangerous to stay there. When another pile is ready to be driven the loftsman repeats the process.
The duty of a header is to trim the head of the piles with a four or five pound ax. He does this continually all day.
The duties of a leadsman are to attach the rig cable to a pile to be driven and, after the pile is picked up and set in the rig, to push and pull on the pile until its lower end is set on the engineer’s stake. The cable is a -kor $4" steel cable which is on a drum attached to the rig. The leadsman grasps the free end of the cable with his hands and drags it to the pile and fastens it to the pile either with shackles or wraps it several times around the pile and hooks it. Thereafter he manipulates the pile with his hands and arms until it is properly set, and stands by the rig until the pile is driven down to where he can unhook the cable. He then unhooks the cable and drags it to the next pile and repeats the process.
Plaintiff testified that since the accident he cannot do any of the work as a pile driver crewman; that he tried once but had to quit after about an hour’s work and his then employer transferred him to another job as a foreman; that as a foreman he has on occasion tried to help out when his crew was shorthanded but found he couldn’t do the work. He testified that he cannot do loftsman’s work because every time he puts his hand on a rope to pull the pile he gets a sharp pain in the “V” between the thumb and forefinger of his left hand and his hand gives way; that it hurts continuously when he grips anything.
He further testified that he cannot do the work of a headerman because when he uses the ax and strikes a pile he gets a “pain like a hot blade that strikes in the side of my hand, will make me drop what I got in my hand because I got a poor grip in my left hand.”
Plaintiff also testified that he could not do the work of a leadsman because whenever he grips anything and pulls on it he has the sharp pain and “you got to be fast in order to put the shackle on there and that’s things I can’t do, I can’t do it.”
Plaintiff testified that he knows he can’t do any of the work of a piledriver crewman because he has tried to do all of it. He said that when he attempts to do any heavy work he gets a pain that goes all the way through the top of his hand.
Dr. Riordan thought that plaintiff could handle an ax but “* * * If he had to be a loftsman and had to hang with his injured hand and throw a rope or cable around the pile with his other hand, well, then, he might be in a little bit of jeopardy because if he hurt his thumb he might reflexively let go, and I think he might be at a greater risk as a loftsman than anything else * * *” Dr. Riordan further testified that in his opinion plaintiff could perform any of the work of a piledriver man if he didn’t have pain.
Dr. Riordan was asked whether he would pass plaintiff as acceptable to do the work of a piledriver man if he conducted a pre-employment physical examination on plaintiff in his present condition. His answer was “not as a loftsman.” He was then asked whether he would pass him for work if he thought the work might entail pressure to the end of his thumb and Dr. Riordan answered:
“Well, I think, that I would handle this something like the military does. Anybody with a pre-existing defect would be *628 hired with a so-called waiver so that anything that happens to the pre-existing damaged part would not be covered by this or if it’s not by a waiver, why, then, you’re liable for anything that happens to it.”
He later testified:
“* * * when we have a condition such as this, which is painful, and if they do hurt it on the job * * * why, then, this becomes an aggravation of a pre-existing defect and the company hiring him is therefore liable * * *”
Dr. LoCoco testified the dislocation of the metacarpal joint would produce weakness in the joint. It was his opinion that plaintiff could not use his left hand hour after hour. He also said that plaintiff can climb but not for a long period of time.
Counsel described the duties of a lofts-man to the doctor and asked if such work would be permissible on a sustained basis and the doctor answered that he knew definitely at this stage he could not do it.
Dr. LoCoco testified that plaintiff might be able to use an ax for ten minutes or so but not for a long period of time. He also testified that he would not pass him for the duties of loftsman or header on a pre-employment physical examination.
The defendant insurer contends that plaintiff has been working steadily as a pile driver crewman ever since his accident except for the time he spent in the hospital.
The record reveals that the first job plaintiff had following his accident was with S. K. Whitty & Company, Inc. at Venice. Plaintiff testified that he worked there as a supervisor at night for about a week and there is no evidence to the contrary. He further testified that he went to work for Lane & Co., a pile driving contractor, in January of 1966 and stayed with that company until around the end of January 1968; that all of his work with Lane & Co. was as a foreman and, supervisor and not as a crewman except that on occasion when his crew was shorthanded he tried “to give them a hand, I couldn’t do it.” In late January of 1968 he went to work for William McWilliam Company as a supervisor and was working for them at Pilottown when he injured his knee on February 7, 1968 following which he has not worked.
Defendant attempted to prove by the payroll records of Lane & Co. that plaintiff worked not only as a foreman but as a piledriver man. These records do not show what kind of work plaintiff did for Lane & Co. All they show is the hours worked and the wages paid. The records do show that plaintiff’s hourly rate of pay fluctuated from time to time and defendant argues that the increases and decreases in plaintiff’s base pay are due to the fact that he sometimes worked as foreman and sometimes as crew member. However cross examination of Mr. Iverson, Lane & Co.’s payroll clerk revealed that plaintiff could have worked continuously as a foreman, as plaintiff testified, and still receive different rates of pay depending upon whether he worked with or without creosote material. The pay scale was also changed several times during this period. The only evidence to show that plaintiff has worked as a crewman since his injury is the statement of Mr. Iverson that he recalled having paid plaintiff at both classifications, both as a piledriver man and as a foreman.
We are of the opinion that plaintiff was employed as a piledriver crewman when he injured his thumb and the fact he was not actually performing piledriver man’s work when injured is immaterial.
We are of the further opinion that the pain he suffers when he attempts to perform the duties of a piledriver man makes it impossible for him to do the work. He can perform the duties of a foreman but foreman’s jobs are not always available. Although he was offered an op *629 eration which if successful would eliminate the pain there is no assurance that the operation would be successful, and since plaintiff had already undergone two unsuccessful operations of the same type we do not consider plaintiff’s refusal of the third operation as being unreasonable.
We are therefore of the opinion that plaintiff is permanently and totally disabled within the meaning of the compensation statute. It is well settled that whenever the worker can show that he is disabled he is entitled to compensation for the period provided in the disability provisions of the Act, even though disability arose from one of the specific losses set forth in the schedule. McGruder v. Service Drayage Co., Inc., 183 La. 75, 162 So. 806; Barr v. Davis Bros. Lumber Co., Limited, 183 La. 1013, 165 So. 185; Malone Louisiana Workmen’s Compensation, Sec. 279, page 352.
Plaintiff has prayed for statutory penalties and attorney’s fees based on the fact that defendant paid no compensation during the period from August 5, 1965 to July 2, 1966 and during the period from September 30, 1966 to November 1, 1967. Payments were stopped during these two periods because defendant’s records revealed plaintiff was working although the records did not indicate the particular type of work plaintiff was doing. We are satisfied that plaintiff was working during these two periods as a foreman.
Plaintiff argues that the insurer should have determined the precise work plaintiff was doing before cutting off compensation and not to have done so subjects the insurer to the penalties provided by law, citing Stroud v. Tremont Lumber Company, La.App., 193 So.2d 86 and McClelland v. Liberty Mutual Insurance Company, La.App., 180 So.2d 19.
The cited cases are not in point factually. In Stroud the penalties were imposed because the only basis for the insurer’s action in stopping payments was a letter received by it from the treating physician which stated he had discharged the plaintiff and had referred him to a Dr. Bonn for evaluation. The letter further stated that the insurer had been furnished with a copy of Dr. Bonn’s report. Dr. Bonn’s report revealed recommendations “for further and drastic treatment if plaintiff’s symptoms persisted.”
In McClelland the Court found the insurer’s action in stopping payments was arbitrary when the only basis for that action was a physician’s report expressing the opinion that plaintiff’s return to light work would be beneficial from a therapeutic standpoint.
Each case must stand on its own facts and circumstances and in our opinion the circumstances of the instant case do not reveal that the stoppage of payments was either arbitrary, capricious or without probable cause and therefore plaintiff’s claim for statutory penalties and attorney’s fees will be denied.
For the foregoing reasons the judgment appealed from is amended and recast so as to read as follows:
“It is ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Clarence Duplantis, and against the defendant, Highlands Insurance Company, for workmen’s compensation benefits at the rate of $35.00 per week commencing June 10, 1965 and continuing for the period of plaintiff’s disability, not however beyond 400 weeks, together with legal interest on each weekly payment from due date until paid and for all costs; the whole subject to a credit for compensation payments previously made.
“It is further ordered, adjudged and decreed that the expert witness fee of Dr. Santo LoCoco be and the same is hereby fixed at the sum of $100.00 and taxed as costs to be paid by the defendant herein.
“It is further ordered, adjudged and decreed that the fee of plaintiff’s attorneys, Badeaux and Discon, be and the same is *630 hereby fixed at the maximum percentage permitted by LSA-R.S. 23:1141 and payable pro-rata out of each compensation payment received by plaintiff under the terms of this judgment.
“It is further ordered, adjudged and decreed that all other demands of plaintiff be and the same are hereby dismissed.”
Costs of this appeal shall be borne by defendant-appellee.
Judgment amended and recast.